1   Todd M. Schneider (SBN 158253)        Jason H. Kim (SBN 220279)
2   Matthew S. Weiler (SBN 236052)        **SCHNEIDER WALLACE**
    Sunny S. Sarkis (SBN 258073)          **COTTRELL KONECKY LLP**
3   **SCHNEIDER WALLACE**                 300 S. Grand Avenue, Suite 2700
    **COTTRELL KONECKY LLP**              Los Angeles, CA 90071
4   2000 Powell Street, Suite 1400        Telephone: (415) 421-7100
    Emeryville, CA 94608                  jkim@schneiderwallace.com
5   Telephone: (415) 421-7100
6   tschneider@schneiderwallace.com
    mweiler@schneiderwallace.com
7   ssarkis@schneiderwallace.com

8   *Counsel for Plaintiff*



FILED
OCT 1 1 2022
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

9

10

11              THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

                                                          SK

13  ┌─────────────────────────────────┐   Case No. _____   CV22    5942
    │ UNITED STATES, ex rel. Donna Fort, │
14  │                                 │
    │                      Plaintiff, │
15  │                                 │   **COMPLAINT FOR VIOLATIONS OF THE**
    │                                 │   **FEDERAL FALSE CLAIMS ACT (31 U.S.C. §**
16  │        v.                       │   **3729 *et seq.*) AND THE CALIFORNIA**
    │                                 │   **INSURANCE FRAUDS PREVENTION ACT**
17  │ ISORAY, INC.; ISORAY MEDICAL, INC.; │ **(Cal. Ins. Code § 12650 *et seq.*)**
    │ LORI WOODS; and DR. STEVEN M.   │
18  │ KURTZMAN, M.D.,                 │
    │                                 │
19  │                     Defendants. │
    └─────────────────────────────────┘
20

21

22

23

24

25

26

27

28





COMPLAINT

1

**TABLE OF CONTENTS**

2

I.    SUMMARY AND INTRODUCTION ................................................................. 1

3

II.   JURISDICTION AND VENUE ....................................................................... 2

4

III.  THE PARTIES ................................................................................................ 2

5

IV.   STATUTORY BACKGROUND ..................................................................... 4

6

V.    FACTUAL ALLEGATIONS .......................................................................... 15

7

VI.   ISORAY'S FRAUDULENT SCHEME ........................................................... 20

8

VII.  DEFENDANTS' SCIENTER ......................................................................... 23

9

VIII. CAUSATION .................................................................................................. 26

10

IX.   CAUSES OF ACTION ................................................................................... 26

11

X.    PRAYER FOR RELIEF ................................................................................. 35

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

Plaintiff United States, through Relator Donna Fort ("Plaintiffs"), allege the following against Defendants Isoray, Inc., Isoray Medical, Inc., Lori Woods, and Dr. Steven M. Kurtzman, (collectively, "Defendants"), based on personal knowledge, the investigation of counsel, and information and belief.

## I.     SUMMARY AND INTRODUCTION

1.     Isoray is a company headquartered in Richland, Washington, which designs and develops personalized brachytherapy products, which place radiation sources (or "seeds") as close as possible to the tumor site to destroy cancer cells. Isoray's featured product, Cesium 131, purportedly provides highly targeted, fast-acting radiation treatment which delivers its energy in a significantly shorter time than conventional radiation therapy. Hospitals and ambulatory surgical centers purchase these "seeds" from Isoray when a physician chooses to prescribe Isoray's Cesium 131 treatment and refers a patient to a hospital or ambulatory surgical center for the treatment.

2.     Cesium-131 "pioneer," Dr. Kurtzman, began working with Isoray as early as 2005, approximately seventeen (17) years ago. Initially, Dr. Kurtzman used the isotope Palladium for his prostate cancer cases, but after an information session with an Isoray representative in 2005, he completed a few cases using Cesium-131.[1] It was not long before Dr. Kurtzman's practice began to exclusively use Cesium-131.

3.     Since 2015 through the present date, Isoray improperly paid Dr. Kurtzman $18,333 per month. From 2015 through 2020, Isoray has made approximately $880,510.47 in improper payments to Dr. Kurtzman. Unlike the physicians legitimately contracted by Isoray, Dr. Kurtzman had either no, or a handwritten, contract with Isoray, contrary to well-established industry practice. Moreover, Dr. Kurtzman provided no services, such as speaking engagements, for which Isoray could legally provide payment. No invoices or bills exist which substantiate the services Dr. Kurtzman provided in exchange for Isoray's $18,333 monthly payment to Dr. Kurtzman.

4.     Dr. Kurtzman performed no documented work for the compensation he received from Isoray. He did not participate in board calls, did not advise on technical issues, was not included in research and development calls, was not involved in physician training (except for one occasion), and

---

[1] Isoray, Cesium-131 Brachytherapy yields better results and changes the patient experience: Dr. Steven Kurtzman, *available at* https://isoray.com/2017/02/cesium-131-brachytherapy-patient-experience-dr-steven-kurtzman/ (*last visited* July 28, 2022).

1  was not involved with sales calls/sales training.[2] Nevertheless, in the Company's FY21 Form 10-K,

2  Isoray falsely states Dr. Kurtzman discharges all these foregoing duties in his position as Medical

3  Director.

4       5.    Dr. Kurtzman is Isoray's largest referral source, representing approximately 30% of

5  Isoray revenue. Isoray continues to make monthly $18,333 payments to Dr. Kurtzman because the

6  company cannot afford to lose his business volume.

7               **II.**    **JURISDICTION AND VENUE**

8       6.    Jurisdiction in the United States District Court for the Northern District of California

9  is conferred by 31 U.S.C. § 3732 and 28 U.S.C. § 1331 because this civil action arises under the federal

10  laws of the United States.

11       7.    This Court has supplemental, or pendent/ancillary, jurisdiction over the remaining state

12  law claims asserted in this Complaint pursuant to 28 U.S.C. § 1367, as the state and federal claims

13  derive from a common nucleus of operative facts.

14       8.    Under 31 U.S.C. § 3730(e), and its California analog, no statutorily relevant public

15  disclosure of the "allegations or transactions" in the Complaint occurred here. Even if there had been

16  any such public disclosure, Relator is an original source of the allegations herein because she has

17  direct, independent and material knowledge of the information that forms the basis of the instant

18  Complaint, and voluntarily disclosed that information to the state and federal government before filing.

19       9.    Venue is proper in the United States District Court for the Northern District of

20  California under 28 U.S.C. § 1391(b) because Defendant Kurtzman transacted business in this district.

21               **III.**    **THE PARTIES**

22       10.    Relator Donna M. Fort ("Relator" or "Ms. Fort") is a resident of the State of Texas.

23  She worked in an executive position as Isoray's Vice President of Sales and Marketing from April 5,

24  2021 through January 17, 2022.  In that capacity, Relator was involved in and aware of Defendants'

25  recurring monthly payment of $18,333 to Dr. Kurtzman and the lack of services provided by Dr.

26  Kurtzman for his purported duties as medical director, contrary to her many years of experience in the

27  _____

28  [2] During Relator's tenure, she observed a single instance where a physician, Dr. Gordon Grado, flew to the San
Francisco Bay Area to observe Dr. Kurtzman's morning cases and to have lunch with Dr. Kurtzman. To date, Dr. Grado
has not used Cesium-131 and continues to treat with Iodine-125 due to cost and reimbursement of Cesium-131.

1   health care industry. Relator files the instant action under the *qui tam* provisions of the FCA (31

2   U.S.C. § 3730(b)(1)) and the California Insurance Fraud Prevention Act (Cal. Ins. Code § 1871.7(a)),

3   alleging violations on behalf of the United States and private insurers in California.

4       11.    Defendant Isoray, Inc. ("Isoray" or the "Company") is a Washington corporation with

5   its corporate headquarters and principal place of business located at 350 Hills Street, Suite 106,

6   Richland, Washington 99354. Defendant Isoray, Inc. is a medical technology company, which engages

7   in the development, manufacture, and sale of isotope-based medical products and devices. The firm

8   focuses on the treatment of cancer and other malignant diseases. Its core product is Cesium-131, a

9   radioisotope for the treatment of malignant tumors. The company was founded by Lance A. Bray in

10  1983. Its CEO and Director is Lori Woods. Isoray's COO and VP of Human Resources is Jennifer

11  Streeter. Its CFO, Secretary, and Chief Accounting Officer is Mark J. Austin. Jonathan R. Hunt is

12  (co-) CFO. William A. Cavanagh is Chief Research and Development Officer. For at least seventeen

13  (17) years, Isoray's premiere product, Cesium-131, has been offered by physicians in Northern

14  California, among other places.

15      12.    Defendant Dr. Steven M. Kurtzman, M.D. ("Dr. Kurtzman" or "Kurtzman") serves as

16  the purported Medical Director for Isoray, Inc. Dr. Kurtzman serves as Director of Prostate Radiation

17  at El Camino Hospital of Los Gatos, Center of Advanced Radiation Therapy, located at 125 South

18  Drive, Los Gatos, California 95032. For sixteen (16) years, Dr. Kurtzman's practice has performed

19  prostate brachytherapy procedures, which is uncommon in the field of radiation oncology. He has

20  been in clinical practice in the San Francisco Bay area since 1998. Dr. Kurtzman's practice has been

21  limited exclusively to prostate brachytherapy since 1999. Dr. Kurtzman has performed over 5000

22  prostate brachytherapy procedures to date. Dr. Kurtzman has also taught the procedure to fellow

23  physicians both nationally and internationally. He has lectured extensively on prostate cancer and

24  brachytherapy. He has authored and co-authored multiple peer reviewed journal articles. He has also

25  been a Principal Investigator in multiple clinical trials in the treatment of prostate cancer.

26      13.    Defendant Lori A. Woods ("Ms. Woods" or "CEO Woods") is Chief Executive Officer

27  of Isoray. She also serves as a member on Isoray's Board of Directors. Ms. Woods served as Vice

28  President of Isoray from 2006 to 2008. In February 2009, Isoray appointed her as Chief Operating

1  Officer, a position she held through January 2010.  Beginning in February 2016, and continuing until

2  her appointment as interim CEO, Ms. Woods served as a senior consultant to Isoray.

3  **IV.    STATUTORY BACKGROUND**

4  **The Anti-Kickback Statute**

5      14.    The federal Anti-Kickback Statute (the "AKS") "makes it unlawful to pay kickbacks

6  'to any person to induce such person . . . to refer an individual' for reimbursable services." *United*

7  *States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 665 (S.D. Tex. 2013) (quoting 42

8  U.S.C. § 1320a7b(b)(2)(A)).

9      15.    The main purpose of the AKS is to protect patients and federal medical programs from

10  fraud, corruption, and abuse by limiting the opportunity for money to influence health care decisions.

11      16.    A person or entity commits a violation of the AKS if the person or entity "knowingly

12  and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or

13  indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an

14  individual to a person for the furnishing or arranging for the furnishing of any item or service for

15  which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. §

16  1320a-7b(b)(2)(A).

17      17.    The AKS, 42 U.S.C. § 1320a-7b(b), prohibits any person or entity from knowingly and

18  willfully receiving "remuneration" to influence either the referral or the arrangement of services

19  reimbursable by a federal healthcare program. 42 U.S.C. § 1320a-7b(b).

20      18.    The statute covers the payers of kickbacks (*i.e.*, those who offer or pay remuneration),

21  as well as the recipients of kickbacks (*i.e.*, those who solicit or receive remuneration). In other words,

22  the prohibition applies to both sides of the transaction – the kickback requester/receiver and the

23  offeror/payer.

24      19.    Courts have broadly defined "remuneration," interpreting it to mean "anything of

25  value." *U.S. ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*, 36 F. Supp. 3d 773, 777 (S.D.

26  Ohio 2014) (quoting *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622 Ill. 2006)); *see also*

27  *Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) ("Congress introduced the broad

28  term 'remuneration' . . . to clarify the types of financial arrangements and conduct to be classified as

illegal under Medicare…. The phrase 'any remuneration' was intended to broaden the reach of the law which previously referred only to kickbacks, bribes, and rebates." (citation omitted)); Medicare & State Health Care Programs: Fraud & Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952-01, 35958 (July 29, 1991) (codified at 42 C.F.R. pt. 1001) ("Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever.").

20.     Legions of courts have held that compliance with the AKS requires that a provider pay fair market value to a physician for his services. *United States v. Rogan*, 459 F. Supp. 2d 692, 722-23 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008) (emphasizing physicians' receipt of payment was far in excess of market value for contractual duties performed in finding violation of AKS); *United States ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1049 (N.D. Ill. 2002). Indeed, "[p]ayment exceeding fair market value is in effect deemed payment for referrals." *Am. Lithotripsy Soc'y v. Thompson*, 215 F. Supp. 2d 23, 27 (D.D.C. 2002). The AKS statute itself states that impermissible remuneration to physicians includes "transfers of items or services for free or other than fair market value." 42 U.S.C. § 1320a-7a(i)(6).

**The Federal False Claims Act**

21.     The Federal False Claims Act ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. 111-21, section 4(f), 123 Stat. 1617, 1625 (2009), provides in pertinent part that a person is liable to the United States Government for three times the amount of damages the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(1)(1)(A).

22.     The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be drawn down or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded;

or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

23.    As amended by FERA, the FCA also makes a person liable to the United States Government for three times the amount of damages which the government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

24.    The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information;" (2) "acts in deliberate ignorance of the truth or falsity of the information;" or (3) "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). The FCA further provides that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b)(1)(B).

25.    FCA claims include claims for medical services, whether actually completed or not, that are rendered in violation of other laws, such as the AKS.

26.    The anti-retaliation provision of the False Claims Act—31 U.S.C. § 3730(h)—provides relief to whistleblowers who are retaliated against because they took action in furtherance of a False Claim Act action or undertook efforts to stop a False Claims Act violation. The provision applies to all types of retaliation, including termination, demotion, suspension, harassment, threats, or any other discrimination in the terms and conditions of employment.

27.    The anti-retaliation provision of the False Claims Act provides remedies designed to "make the employee whole." Available remedies include (1) reinstatement in the same or a comparable position as would have been held if the discrimination not occurred; (2) two times the amount of back pay, plus interest; and (3) special damages resulting from the discrimination, including reasonable attorneys' fees and litigation costs.

**The Medicare Program**

28.    Medicare is administered by the United States Government and provides health coverage to people 65 years of age and older. Medicare's costs are staggering. In 2014, Medicare expenditures accounted for 14% of all federal spending.

29.     To administer the Medicare program, private insurance companies act as agents of the Department of Health and Human Services, making payments on behalf of the program beneficiaries and providing other administrative services.  42 U.S.C. §§ 1395h and 1395u.  These companies are called "carriers."  See 42 C.F.R. § 421.5(c).  Through local carriers, Medicare establishes and publishes the criteria for determining what services are eligible for reimbursement or coverage.  This information is made available to the providers who seek reimbursement from Medicare.

30.     To ensure taxpayers' dollars are funding truly necessary and appropriate medical treatment, Medicare providers are prohibited from submitting reimbursement claims for items and services neither reasonable nor necessary for the diagnosis or treatment of a Medicare patient. 42 U.S.C. § 1395y(a)(1)(A).

31.     Medicare, along with the Department of Health and Human Services, have long prohibited providers from charging Medicare for services which are tainted by unlawful kickbacks. Unlawful kickback schemes are strictly prohibited by the Medicare statutes and give rise to False Claims Act liability.

32.     The Affordable Care Act, passed in March 2010, made explicit that violations of the Anti-Kickback Statute (42 U.S.C. § 1320a-7b) gave rise to False Claims Act liability: "a claim that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

33.     Specifically, the Anti-Kickback Statute creates liability for "whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. . . ." 42 U.S.C. § 1320a-7b(b)(2)(A) (emphasis added).

34.     Interpretations of this language by the federal authorities provide useful guidance in applying anti-kickback laws. The Department of Health and Human Services, Office of the Inspector General ("OIG") has issued various advisory opinions regarding indicia of illicit schemes that

1   providers have employed to defraud Medicare. Medicare reimburses health care providers for the costs

2   of providing covered health services to Medicare beneficiaries. See 42 U.S.C. § 1395x(v)(1)(A).

3       35.    In order to bill Medicare Part A, a provider must submit an electronic or hard-copy

4   claim form called the UB-04 (also known as the CMS 1450) to the appropriate Medicare carrier. To

5   bill Medicare Part B, a provider must submit an electronic or hard copy claim form called the CMS

6   1500 (formerly known as HCFA 1500) to the appropriate Medicare carrier. These forms describe,

7   among other things, the provider, the patient, the referring physician, the service(s) provided by

8   procedure code, the related diagnosis code(s), the dates of service, and the amount charged. The

9   provider certifies on the CMS 1500 claim form that the information provided is truthful and that the

10  services billed on the form were "medically indicated and necessary." The provider certifies in the

11  UB-04 that "[s]ubmission of this claim constitutes certification that the billing information as shown

12  on the face hereof is true, accurate, and complete."

13      36.    In addition, each Medicare provider must sign a provider agreement and by so doing

14  must agree to comply with all Medicare requirements including the fraud and abuse provisions. A

15  provider who fails to comply with these statutes and regulations is not entitled to payment for services

16  rendered to Medicare patients.

17      37.    As a prerequisite to payment, Medicare also requires hospitals to submit annually a

18  Form CMS-2552-10 (previously form HCFA-2552), more commonly known as the Hospital Cost

19  Report. Cost reports are the final claim that a provider submits to the fiscal intermediary for items and

20  services rendered to Medicare beneficiaries.

21      38.    Every Hospital Cost Report contains a "Certification" that must be signed by the chief

22  administrator of the provider or a responsible designee of the administrator. Through this certification,

23  the provider confirms that the cost report is "a true, correct and complete statement" and that the

24  services identified "were provided in compliance with [the laws and regulations regarding the

25  provision of the health care services]." The certification also states: "if services identified in this report

26  were provided or procured through the payment directly or indirectly of a kickback or were otherwise

27  illegal, criminal, civil and administrative action, fines and/or imprisonment may result."

28

39.    Medicare pays hospitals for providing inpatient and outpatient care. Since 1983, Medicare and other federally funded health insurance programs have reimbursed hospitals for inpatient care through a prospective payment system based on classification of patients through Diagnosis Related Groups ("DRGs").  DRGs are groups of clinically similar diagnoses and/or procedure codes, which are presumed to have similar resource utilization.  Medicare pays a fixed amount per case by DRG.

40.    Payments for outpatient hospital services are also based on a bundled, per-case payment system.  Hospitals use Ambulatory Payment Classification ("APC") codes to bill for costs associated with outpatient services.  Like the DRG-based payment system for inpatient services, Medicare reimburses hospitals for outpatient services through standardized payments determined by the APC to which the claim is assigned.

41.    Each claim is assigned one or more APCs based on the procedure codes (*i.e.*, HCPCS code, as described below) included on the claim form.  Unlike inpatient DRG payments, where the hospital generally receives only one DRG payment per case, hospitals can receive multiple APC payments for the same outpatient case, depending on the nature of the services provided.

42.    Physician services provided to either inpatients or outpatients are billed and reimbursed separately from the hospital's DRG- or APC-based payment.  Physician services are reimbursed through a payment system based on the Healthcare Common Procedure Coding System ("HCPCS"). HCPCS is a standardized coding system that groups procedures based on the level of professional effort required to render the service.  Medicare pays physicians a fixed "global" amount for their services when they are performed in a physician's office.  This payment includes both a "professional" component to compensate for the physician's services and a "facility" component to compensate for the cost of office space, supplies, etc.

43.    When a physician performs services in a hospital setting (either inpatient or outpatient), Medicare pays the physician a "professional" fee, but does not pay the physician the "facility fee." Instead, the hospital is reimbursed for these costs through the DRG or APC payment.

44.    The dichotomy between the professional and overhead components of the Medicare payment is more complicated where the physicians provide services through "provider-based"

physicians' offices. Medicare allows certain physician practices to be considered part of the hospital facility, even when they are not physically located in a traditional hospital facility. If a provider practice qualifies as "provider based," the physicians may bill for their professional services the same way they would bill for services performed in a traditional hospital outpatient department, and then the hospital may bill the "facility" component of the service using the APC system. See 42 CFR § 413.65. As a general matter, Medicare pays hospitals substantially more for the "facility" component of provider-based physician services than it pays to independent physicians who provide the same services in an office setting.

**Medicare – Claims under Medicare Part B**

45.    Nonemergency services to Medicare beneficiaries may be paid for if the coverage requirements for the services are met and are not covered as Part A emergency inpatient services. Program payment may be made for the following Part B medical and other health services furnished by a U.S. nonparticipating hospital on a nonemergency basis: X-ray, radium, and radioactive isotope therapy, including materials and services of technicians. (The hospital must meet the applicable conditions of participation for these services.)

46.    Overall responsibility for the administration of Medicare, as authorized by 42 U.S.C. § 1395, *et seq*., (hereafter "Social Security Act or SSA"), resides with the Secretary of the Department of Health and Human Services (hereafter "HHS"). Within HHS, the responsibility for administration of the Medicare program has been delegated to the Centers for Medicare Services (hereafter "CMS").

47.    Medicare provides two basic types of coverage – hospitalization insurance (commonly known as Medicare Part A) and medical insurance (commonly known as Medicare Part B). Part A hospital insurance provides coverage for inpatient hospital charges, post-hospital extended care for 100 days following hospital discharge, and hospice care. Part B medical insurance covers physician services, home health services, most skilled nursing home services, and other non-hospital related medical services. 42 U.S.C. § 1395k; 42 C.F.R. § 410.10.

48.    The United States provides reimbursement for Medicare claims from the Medicare Trust Fund through CMS. To assist in the administration of Part B of the Medicare Program, CMS

contracts with Medicare administrative contractors ("MACs"). 42 U.S.C. § 1395u. MACs are responsible for processing the payment of Part B claims to providers on behalf of CMS. *Id.*

49.     As a condition of participation in the Medicare Part B program, providers agree to be familiar with, and abide by, the program's reimbursement policies. In particular, when providers submit their Medicare Enrollment Applications, they certify to the following requirements:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare. I agree that any existing or future overpayment made to the supplier by the Medicare program may be recouped by Medicare through the withholding of future payments. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

50.     Medicare covers, and participating providers agree to submit claims, only for services that are medically necessary to diagnose and treat illness or injury, and for which the provider maintains adequate supporting documentation, for example, physician's orders, physician's review of work, and other pertinent documentation corroborating the treatment administered. 42 U.S.C. §1395y(a)(1)(A).

51.     Absent certain exceptions, Medicare Part B does not cover, and providers agree not to submit claims for, services provided that are not necessary, not appropriately administered, or not properly documented.

52.     In short, for Defendants to be properly reimbursed for patient care by the Medicare program, CMS requires that the treating physician order the applicable services, appropriately document the justification and administration of those services, submit only those codes that correlate with the notes made by the physician in the medical record, and that the physicians adhere to coding guidelines when assigning applicable codes.

53.     After enrollment as a Medicare health care provider, Medicare assigns each participating provider a unique billing National Provider Identifier ("NPI").

54.    A provider who treats a Medicare patient is required to submit an electronic or hard-copy Medicare Health Insurance Claim Form (CMS form 1500) to the carrier who on behalf of CMS, pays for the claim. Providers are required to submit these claims electronically.

55.    When submitting a claim using the CMS-1500 form, the provider/supplier also "certif[ies]" that (i) the information on the form is "true, accurate and complete;" (ii) payment of the claim will be from federal funds; and (iii) "any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal … laws."

56.    Pursuant to the Social Security Act, Medicare pays physicians under the Medicare Physician's Fee Schedule for "all physicians' services." 42 U.S.C. § 1395w-4(a)(1). The SSA defines "physicians' services" for the purposes of the Medicare Physician's Fee Schedule to include certain items and services described in the SSA. 42 U.S.C. § 1395w-4(j)(3).

57.    The American Medical Association assigns and publishes numeric codes, known as Current Procedural Terminology (CPT) and Health Care Financing Administration Procedure Coding System (HCPCS) codes. The codes are a systematic listing of procedures and services performed by health care providers. They include codes for radiation oncology and related services, based on complexity, supervision, and documentation requirements. Health care providers and health care benefit programs use CPT and HCPCS codes to describe and evaluate the services for which they claim, and to decide whether to issue or deny payment. Each health care benefit program establishes a fee reimbursement for each procedure described by a CPT or HCPCS code.

58.    In the Medicare Physician's Fee Schedule, which Medicare publishes yearly, all the CPT codes are listed, together with the reimbursement Medicare allows for each code. Medicare lists the amount of reimbursement paid in the facility setting (*i.e.*, hospital) and the non-facility setting (*i.e.*, office).

59.    CPT Codes often are comprised of a Technical Component and a Professional Component.  The Technical Component represents the cost of the equipment, supplies and personnel to perform the procedure.  The Professional Component represents the physician or other healthcare professional work portion.  A "Global Service" includes both the Technical Component and the Professional Component.

60.    When completing the CMS 1500 claim form, the use or absence of a "modifier" with the applicable CPT code can supply additional information regarding the scope of the service being billed.

61.    To bill globally when a CPT code includes both a technical and a professional component, no modifier is used with the CPT code for the procedure, indicating that the claim is for both the technical and professional services.

**The California Insurance Frauds Protections Act**

62.    Additionally, pursuant to the California Insurance Frauds Protections Act ("IFPA"), which is located under section 1871.7(a) of the California Insurance Code, it is "unlawful to knowingly employ runners, cappers, steerers, or other persons to procure clients or patients to perform or obtain services or benefits . . . or to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis of a claim against an insured individual or his or her insurer." This provision has been construed as prohibiting charging private insurers for services procured via kickbacks.

63.    The IFPA allows members of the public to file private qui tam suits against anyone who commits insurance fraud in the state. Like the Federal False Claims Act, any person or entity that violates the IFPA is subject to a civil penalty of up to $10,000 for each claim submitted to an insurer for payment. The person or entity is also subject to treble damages for the amount of the claim for compensation billed to the insurer.

64.    Unlike the non-insurance-related false claims *qui tam* actions, under the IFPA it is not necessary that the government suffer harm because of the fraud. This is because insurance fraud usually harms many people, as insurance companies frequently cite insurance fraud losses in raising rates for policyholders. (For example, the IFPA states that healthcare insurance fraud likely increases national healthcare costs by "billions of dollars annually.") Thus, individuals who sue fraudulent actors under the IFPA are acting on behalf of themselves and every one of their fellow policyholders.

65.    The IFPA further imposes civil penalties for any violation of Cal. Penal Code § 550, which makes it unlawful to:

a.    "Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim" (Cal. Penal Code § 550(a)(5)).

b.    "Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit" (Cal. Penal Code § 550(a)(6)).

c.    "Present or cause to be presented any writing or statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact" (Cal. Penal Code § 550(b)(1)); and

d.    "Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact" (Cal. Penal Code § 550(b)(2)).  It is additionally unlawful to aid, abet, solicit, and/or conspire with any person to do any of the above.  *Id.*

66.    Under California Insurance Code § 1871.7(k), the IFPA also broadly protects employees from retaliation for filing or even supporting an IFPA *qui tam* action: the Act states that employees suffering retaliation for their involvement in reporting insurance fraud "shall be entitled to all relief necessary to make the employee whole." Specifically, the IFPA requires that the employee reinstate the employee with the same seniority the employee would have had if not for suffering the retaliation, pay the employee twice the amount of backpay he or she is due, plus interest, and compensate the employee "for any special damages sustained as a result of the discrimination," including attorneys' fees and reasonable litigation costs. Employees who suffer discrimination because of their involvement in an IFPA action and wish to pursue damages for their injuries must file suit within three years of when they discover "the facts constituting the grounds" for the action or within eight years of the retaliatory act.

**Other Federal and State-Funded Health Care Programs**

67.    The Federal Government administers other health care programs including, but not limited to, TRICARE/CHAMPUS, CHAMPVA, and federal workers' compensation programs.

1  TRICARE/CHAMPUS, administered by the United States Department of Defense, is a health care

2  program for individuals and dependents affiliated with the armed forces. 10 U.S.C. § 1071 *et seq.*; 32

3  C.F.R. § 199.4(a).

4      68.    CHAMPVA, administered by the United States Department of Veterans Affairs, is a

5  health care program for the families of veterans with 100 percent service-connected disability. 38

6  U.S.C. § 1781 *et seq.*; 38 C.F.R. § 17.270(a).

7      69.    The Federal Employees' Compensation Act provides workers' compensation coverage,

8  including coverage of medical care received as a result of a workplace injury, to federal and postal

9  employees. The Act is administered by the Department of Labor, Division of Federal Employees'

10  Compensation. 5 U.S.C. § 8101 *et seq.*; 20 C.F.R. § 10.0 *et seq.*

11                     V.    **FACTUAL ALLEGATIONS**

12      70.    On March 23, 2021, Isoray offered the position of Vice President of Sales and

13  Marketing to Ms. Fort at an annual salary of $300,000 per year.

14      71.    On March 23, 2021, Ms. Fort formally accepted Isoray's Offer of Employment, and

15  she began her employment on April 5, 2021.

16      72.    On her first day with Isoray, CEO Lori Woods informed Ms. Fort of the importance of

17  Dr. Kurtzman as a referral source for Isoray's product, as his patients constituted 30% of Isoray's

18  revenue. Ms. Woods further advised that Ms. Fort should not discuss Dr. Kurtzman in email or

19  writings, but that such discussions should only take place orally.

20      73.    On or around June 21 through 24, 2021, while the Isoray executive team met in

21  Richland, Washington, Ms. Fort first learned that Isoray paid Dr. Kurtzman $18,333 per month.

22      74.    Ms. Fort also learned that, unlike the physicians legitimately contracted by Isoray, Dr.

23  Kurtzman had either no, or a handwritten, contract with the company. Moreover, she learned that Dr.

24  Kurtzman held no teaching positions, honorariums, or speaking engagements for which the company

25  could legally pay him. Likewise, she learned that no invoices or bills exist which substantiate Isoray's

26  $18,333 monthly payment to Dr. Kurtzman. This was all contrary to well-accepted industry practice,

27  of which Ms. Fort was aware from her long history as a sales executive in the health care industry.

28

75.    Ms. Fort worked closely with Isoray's Vice President of Business Development, Lisa Lauer, and Vice President of Finance, Mark Austin. During the June 2021 executive team meeting, Ms. Lauer communicated to Ms. Fort that she thought the recurring $18,333 monthly payment to Dr. Kurtzman was inappropriate.

76.    Ms. Fort asked Ms. Lauer and Mr. Austin if they were aware of any work performed by Dr. Kurtzman justifying the monthly payment of $18,333. Both Ms. Lauer and Mr. Austin confirmed Dr. Kurtzman performed no work, and that he only holds the cosmetic title of "Medical Director."

77.    At this time, Ms. Fort informed both Ms. Lauer and Mr. Austin of her many concerns about these inappropriate payments and further advised that the payments posed a significant legal risk.

78.    On or around June 24, 2021, CEO Lori Woods drove Ms. Fort from Richland, Washington, to Seattle, Washington, for Ms. Fort's return flight to Texas. During their drive, Ms. Fort raised the issue of the payments made to Dr. Kurtzman, and Ms. Fort further inquired as to the duties performed by Dr. Kurtzman and the existence of invoices and/or documentation supporting the monthly payments. Ms. Fort advised Ms. Woods of the legal risk to the Company. Ms. Fort further advised that the payments made to Dr. Kurtzman were easily traceable, and that Isoray must provide invoice documentation to support the monthly payments.

79.    CEO Woods replied that Dr. Kurtzman was the Medical Director for Isoray. Ms. Woods further explained that Isoray was a small company that could "fly under the radar." Ms. Woods told Ms. Fort that Isoray needs his sales of Cesium-131 to patients, constituting approximately 30% of Isoray's sales volume. CEO Woods stated that Dr. Kurtzman used to make "a LOT more," but Isoray reduced it. At various times during Relator's employment with Isoray, Woods repeated these same three justifications for the unusual relationship between Isoray and Dr. Kurtzman.

80.    On September 28, 2021, and October 4, 2021, Relator attended a Microsoft Teams call with CEO Woods. During this call, Ms. Woods told Relator to review the contracts with all Isoray's physicians with Mr. Austin. Relator asked if she should review Dr. Kurtzman's contract with Isoray, and Ms. Woods instructed Relator in the negative, advising that she did not need to do so at this time.

81.    On October 7, 2021, Relator attended a Microsoft Teams call with Mr. Austin, during which physician contracts with Isoray were discussed.  The working group decided that the acceptable hourly rate for physicians is $300 to $500 per hour.

82.    All physicians under contract with Isoray, except for Dr. Kurtzman, submitted invoices and documentation through Regina Lowry, Sales Operations, reported to Ms. Fort.

83.    After the October 7, 2021 meeting, Mr. Austin informed Relator that Isoray's "contract" with Dr. Kurtzman constitutes a single, handwritten piece of paper, dating back to 2007, with various handwritten updates. To date, Relator has not personally seen this handwritten document. Because Ms. Woods was Chief Operating Officer for Isoray in 2007, she purportedly has direct knowledge of this agreement.

84.    On or around October 11, 2021, during a Microsoft Teams call with CEO Woods, Relator informed Ms. Woods of her October 7, 2021 meeting with Mr. Austin. Relator informed Ms. Woods that the working group did not review Dr. Kurtzman's contract.

85.    On or around October 11, 2021, Relator also informed CEO Woods that, to justify his recurring monthly payment of $18,333, Dr. Kurtzman should perform approximately thirty-six (36) hours of documented work. Relator advised Ms. Woods that during her seven (7) months with Isoray, she had witnessed Dr. Kurtzman perform only one (1) duty as Medical Director for the Company (and that event was Dr. Grado observing two (2) morning cases with Kurtzman, referenced above in Footnote 2). Relator even suggested that Dr Kurtzman participate in project/product research and development (Microsoft Teams) calls which were held frequently, often weekly.

86.    During their October 11, 2021 discussion, Relator twice warned CEO Woods of the risk this arrangement with Dr. Kurtzman posed to Isoray, but Woods ignored the warning, again stating that, while she was unhappy with the arrangement, Isoray was a "small company," noting again that Dr. Kurtzman used to be paid "a lot" more, and that she reduced his monthly payment down to $18,000 per month.

87.    On or around November 1, 2021, Isoray planned to increase the price of Cesium-131. This price increase infuriated Dr. Kurtzman, who, with his partners, owned an ambulatory surgical center that itself purchased Cesium-131 from Isoray.

88.     Relator knew that Dr. Kurtzman could have used the Iodine I-125 isotope for one-third (1/3) of the price of Cesium-131 for a similar radiation-based cancer therapy and is unaware of any clinical benefit for the use of the more expensive Cesium-131 therapy.

89.     On or around October 14, 2021, Relator had a lengthy telephone conversation with Dr. Kurtzman. During the call, Dr. Kurtzman was "furious" with Relator personally, stating that if he did not have this "arrangement" with Isoray, he would switch to Iodine, as it costs "much less" than Cesium-131.

90.     During the October 12 through October 14, 2021 time frame, Relator informed CEO Woods of Dr. Kurtzman's response to the price increase for Cesium-131, and Ms. Woods advised that Dr. Kurtzman's accounts would receive a discount, stating "we need his business, as he is 30% of our revenue."

91.     On or around November 8, 2021, Relator attended a Microsoft Teams call with CEO Woods, wherein Relator again suggested projects for Dr. Kurtzman to substantiate his recurring monthly payment of $18,333.

92.     Relator also informed Ms. Woods that the only "work" she witnessed Dr. Kurtzman perform during her ten (10) month tenure with Isoray was having an Arizona doctor travel from Arizona to California to observe Dr. Kurtzman's cases and have lunch with Dr. Kurtzman. Mr. Kurtzman spent a few hours at most with this visiting physician.

93.     During their November 8, 2021 call, CEO Woods informed Relator that, while she believed Dr. Kurtzman could be utilized more, she did not want to talk further about this topic. This was the last time Ms. Fort raised the issue with Ms. Woods.

94.     On or around January 11, 2022, the Food and Drug Administration ("FDA") contacted Isoray to notify it would be conducting a voluntary audit, to which Isoray agreed. The FDA's audit was set to commence on January 19, 2022.

95.     On January 17, 2022, two (2) days before the FDA's audit was scheduled to begin, CEO Woods and Chief Operating Officer Jennifer Streeter met with Relator via a Microsoft Teams call. During this call, Ms. Woods and Ms. Streeter terminated Relator. No explanation was provided to Relator, beyond that the Company decided to go in "a different direction." Given the suddenness of

the termination, and its proximity to the FDA inspection, Relator infers that she was terminated to prevent her from disclosing her concerns about Isoray's relationship to Dr. Kurtzman in connection with the FDA audit.

96.     To thwart any potential whistleblower claims, or qui tam actions, Isoray presented Relator with a severance offer of $50,000 so long as she agreed to sign a comprehensive Severance Agreement within 30 days of her involuntary departure.

97.     Relator was surprised by the sheer volume of legal rights the Severance Agreement asked her to waive, which was unusual in her experience. The Severance Agreement purported to have her waive: "All legal and equitable rights arising out of your employment or separation from employment with us. This includes but is not limited to all liabilities and claims, direct or indirect, under any local, state, or federal authority. This includes but is not limited to city, county, Texas and federal statutes, regulations, executive orders, ordinances, and common law dealing with the enforcement of the rights of employees."

98.     The Severance Agreement further included waiver of: "Any and all wage claims, claims of discrimination, demands, damages, causes of action and suit, claims for compensation, attorney's fees and expenses on account of or in any way arising out of your employment or separation from employment with us, on or before the effective date of this Agreement."

99.     The Severance Agreement continued: "Although this is not a complete list, here are examples of the specific types of claims you are giving up: Claims under federal law such as the Age Discrimination in Employment Act (ADEA) the Employee Retirement Income Security Act (ERISA), the Family and Medical Leave Act (FMLA), the Genetic Information Nondiscrimination Act (GINA), Title VII of the Civil Rights Act (relating to protection from discrimination, harassment, and retaliation on the basis of race, color, religion, sex, or national origin), the Lilly Ledbetter Fair Pay Act, the Equal Pay Act (EPA), the National Labor Relations Act (NLRA), the Occupational Safety and Health Act (OSHA), the Sarbanes-Oxley Act, the Worker Adjustment and Retraining Notification Act (WARN Act), and the Uniformed Services Employment and Reemployment Rights Act (USERRA); claims under any and all Texas state laws, including without limitation any and all claims under the Texas Labor Code, the Texas Payday Law, the Texas Anti-Retaliation Act, Chapter 21 of the Texas

Labor Code, and the Texas Whistleblower Act; claims under local law (city or county ordinances); claims for wrongful discharge, discrimination, harassment, interference with protected leave, or retaliation; common law torts (including but not limited to intentional or negligent infliction of emotional distress and invasion of privacy); and any claims or causes of action arising out of any express or implied written or oral communication that we have made."

100.    Relator had never seen reference to whistleblower claims in any severance agreement.

101.    Relator refused to execute the Separation Agreement and was not paid under its terms.

## VI.    ISORAY'S FRAUDULENT SCHEME

102.    Defendant Isoray systematically used its handwritten physician agreement with Dr. Kurtzman as a vehicle to ensure it would retain 30% of its revenue from Dr. Kurtzman's referrals. Dr. Kurtzman is Isoray's largest and most important customer.

103.    In executing the kickbacks to Dr. Kurtzman, Isoray sought to retain Kurtzman's physician "services" indefinitely because he had multiple patients for which he used Cesium-131, Isoray's premiere isotope.

104.    The opportunity to enter this paid "arrangement" with Dr. Kurtzman, and the monthly payment of $18,333 for this arrangement, qualify as remuneration under the federal AKS, whether the payment was fair market value for services actually rendered.

105.    The Patient Protection and Affordable Care Act, Pub. L. No. 111-148 (the "ACA"), was signed into law on March 23, 2010. Section 6002 of the ACA, codified at 42 U.S.C. § 1320a–7h, requires manufacturers of medical devices to make "transparency reports" to the U.S. Department of Health and Human Services ("HHS") disclosing their payments to physicians beginning in 2013, and requires that HHS make such reports available to the public. Final rules regarding such transparency reports were adopted and published in the Federal Register on February 8, 2013 (78 F.R. 9521), codified at 42 C.F.R. §§ 403.900 - 403.914. HHS has implemented these statutes and regulations by publishing the Open Payments Data (see https://www.cms.gov/openpayments).

106.    Open Payments data reveals that Defendants paid Dr. Kurtzman the following amounts for the years 2015 through 2020:

| Year | Number of Payments | Service Purportedly Rendered | Total Amount Paid |
|------|-------------------|------------------------------|-------------------|
| 2015 | 12 | Consulting | $219,996.00 |
| 2016 | No Data Provided on Open Payments website.[3] | NA | NA |
| 2017 | 12 | Consulting | $219,996.00 |
| 2018 | 12 (in addition to Food and Beverage payments of $526.47) | Consulting | $200,522.47 |
| 2019 | 12 (in addition to Food and Beverage payments/faculty speaking fee of $1,173.54) | Consulting | $221,169.54 |
| 2020 | 12 | Consulting | $219,996.00 |
| **TOTAL** | | | **$880,510.47** |

*See* Open Payments, available at https://openpaymentsdata.cms.gov/physician/50697, (last visited June 8, 2022).

107.    Medical directorship contracts are in writing for a limited term and provide for an hourly compensation rate to be paid upon physician's submissions of monthly invoices specifying the types and hours of services provided. This practice ensures that the compensation reflects services actually rendered. These standards for medical director contracts are well-known in the industry.

108.    Isoray's purported "contract" with Dr. Kurtzman, however, is either non-existent, or it did not provide the appropriate amount of information, including the amount paid for the type of service(s) provided by Dr. Kurtzman. As alleged above, to the extent any such "contract" exists, it was purportedly handwritten in 2007, updated by handwritten notes, and the only persons believed to have actually viewed it are CEO Woods and Mark Austin (Vice President of Finance).

109.    Isoray did not require Dr. Kurtzman to provide accurate or timely documentation of the services, if any, he provided. Isoray did not enforce any requirement that Dr. Kurtzman do so, and Dr. Kurtzman made no effort to provide such documentation. Instead, Isoray simply paid Dr. Kurtzman the monthly rate of $18,333, or quite possibly more, each and every month, for years.

---

[3] This information potentially indicates that Defendants did not report payments made to Dr. Kurtzman in 2016 to HHS, as required by law. Defendants' potential concealment of such information supports Relator's fraud allegations, considering that if Defendants failed to report such payments, Defendants have violated laws imposing duties upon them to openly disclose such payments by filing transparency reports in this instance.

COMPLAINT

21

110. When entering this "arrangement," Defendants and Dr. Kurtzman did not intend that Dr. Kurtzman would render any services whatsoever. Indeed, Dr. Kurtzman performed no services except as described above in the ten (10) months Relator worked as an executive for Isoray.

111. In Isoray's Annual Form 10-K Report, the Company states: "The head of the single largest physician practice also serves as the Company's medical director. As the medical director, this physician advises the Company Board of Directors and management, provides technical advice related to product development and research and development, and provides internal training to the Company sales staff and professional training to our sales staff and to other physicians."

112. In Relator's ten (10) months employed with Isoray, Dr. Kurtzman performed none of the activities described in this report, beyond his meeting and lunch with Dr. Grado. This statement is a boldfaced misrepresentation.

113. All other physicians to whom Isoray paid compensation performed services such as teaching, honorariums, and speaking engagements. These physicians also had written contracts and invoices detailing the work for which Isoray paid them.

114. In his practice, Dr. Kurtzman referred patients with prostate cancer to hospitals and ambulatory surgical centers for treatment with Isoray's Cesium-131. Prostate cancer is more likely to develop in older men, and about 6 cases in 10 are diagnosed in men who are 65 or older.[4] The average age of men at diagnosis is about 66.[5]

115. In the United States, the vast majority of the nation's 54 million adults aged 65 and over receive Medicare. Indeed, as of October 2021, 93% of the nation's elderly population received Medicare.[6]

116. These statistics give rise to a strong inference that all, or a majority of, Dr. Kurtzman's patients for which he used Cesium-131 are Medicare recipients. On information and believe, most of

---

[4] American Cancer Society, Key Statistics for Prostate Cancer, *available at* https://www.cancer.org/cancer/prostate-cancer/about/key-statistics.html#:~:text=Prostate%20cancer%20is%20more%20likely,at%20diagnosis%20is%20about%2066. (*last visited* June 8, 2022).
[5] *Id.*
[6] Giefer, Katherine G. & King, Michael D., "*One in Six Older Americans Received Needs-Based Assistance Even Before Pandemic*," U.S. Census Bureau, Oct. 28, 2021, *available at* https://www.census.gov/library/stories/2021/10/what-happens-when-older-adults-struggle-to-make-ends-meet.html (*last visited* June 8, 2022).

these patients reside in California and some of these California patients are also covered in whole or in part by private insurance.

117.    Because of the acts described above, the Defendants knowingly caused to be presented, false or fraudulent claims to the United States Government and private insurers for payment or approval.

118.    Isoray paid Dr. Kurtzman $18,333 per month in return for Dr. Kurtzman's continued use of Isoray's Cesium-131 in violation of the AKS.    Therefore, the claims submitted by the ambulatory service centers, and hospitals, for services related to Cesium-131 performed by Dr. Kurtzman, violate the AKS, and, therefore, constitute violations of the False Claims Act.

119.    Isoray caused false claims to be submitted by paying monthly remuneration to Dr. Kurtzman in violation of the AKS and False Claims Act in exchange for Dr. Kurtzman's continued use of Cesium-131.

120.    Dr. Kurtzman caused false claims to be submitted by accepting monthly remuneration from Isoray in violation of the AKS and False Claims Act in exchange for his continued use of Cesium-131.

121.    Each sale of Cesium-131 that resulted from the Defendants' illegal kickbacks represents a false or fraudulent record or statement. Each claim form, provider agreement, cost report, or other such form submitted to the Government from Cesium-131 sales resulting from the Defendants' illegal kickbacks is also a false or fraudulent record or statement. Each claim for reimbursement for such kickback induced sales submitted to a federal health insurance program represents a false or fraudulent claim for payment.

**VII.    DEFENDANTS' SCIENTER**

122.    At all relevant times, Defendants acted (1) knowingly – that is, with actual knowledge, in deliberate ignorance, or with reckless disregard – with respect to the fact that they were causing Dr. Kurtzman to submit false claims to Medicare, and to make false records or statements material to false claims or to get claims paid, as alleged here; and (2) knowingly and willfully with respect to the AKS violations alleged here.

123.    At all relevant times, Dr. Kurtzman was familiar with the requirements of the AKS and FCA, as evidenced, among other things, by his, and/or his medical center's, certifications in Medicare enrollment applications and hospital cost reports.

124.    Specifically, all Defendants were familiar with the FCA's prohibition on submitting Medicare claims resulting from violations of the AKS. Notwithstanding the wealth of industry knowledge regarding improper payment, *i.e.*, remuneration, to medical directors for unrendered services, and voluminous literature regarding the prohibition on claim submissions which violate the AKS, Defendants Isoray and CEO Woods knew of their wrongful conduct because Relator advised them their conduct was illegal on numerous occasions, as discussed above.

125.    As detailed above, Relator worked closely with Isoray's Vice President of Business Development, Lisa Lauer, and Vice President of Finance, Mark Austin. In or around June 2021, Ms. Fort asked Ms. Lauer and Mr. Austin if they were aware of any work performed by Dr. Kurtzman justifying the monthly payment of $18,333. Both Ms. Lauer and Mr. Austin confirmed Dr. Kurtzman performed no work, and that he only holds the cosmetic title of "Medical Director." At this time, Relator informed both Ms. Lauer and Mr. Austin of her many concerns about these inappropriate payments and further advised that the payments posed a significant legal risk.

126.    On or around June 24, 2021, Relator raised the issue of the payments made to Dr. Kurtzman to CEO Woods, and further inquired as to the duties performed by Dr. Kurtzman and the existence of invoices and/or documentation supporting the monthly payments. Relator advised Ms. Woods of the legal risk to the Company. Relator further advised that the payments made to Dr. Kurtzman were easily traceable, and that Isoray must provide invoice documentation to support the monthly payments.

127.    CEO Woods replied that Dr. Kurtzman was the Medical Director for Isoray. Ms. Woods further explained that Isoray was a small company that could "fly under the radar." Ms. Woods told Relator that Isoray needs his sales of Cesium-131 to patients, constituting approximately 30% of Isoray's sales volume. CEO Woods stated that Dr. Kurtzman used to make "a LOT more," but Isoray reduced it. At various times during Relator's employment with Isoray, Woods repeated these same three justifications for the unusual relationship between Isoray and Dr. Kurtzman.

128.    During an October 11, 2021 discussion, Relator twice warned CEO Woods of the risk this arrangement with Dr. Kurtzman posed to Isoray, but Woods ignored the warning, again stating that, while she was unhappy with the arrangement, Isoray was a "small company," noting again that Dr. Kurtzman used to be paid "a lot" more, and that she reduced his monthly payment down to $18,000 per month.

129.    When Isoray considered raising the price on Cesium-131, on or around October 14, 2021, Relator had a lengthy telephone conversation with Dr. Kurtzman. During the call, Dr. Kurtzman was "furious" with Relator personally, stating that if he did not have this "arrangement" with Isoray, he would switch to Iodine, as it costs "much less" than Cesium-131.

130.    Moreover, it is well-known in the industry that medical directorships are problematic and need to be done in a careful way.  It is well-established in the medical field that there are specific guidelines regarding medical directorships, their structure, and permissive uses.  There is a mammoth amount of literature and guidance from the OIG, law firms, and other regulatory bodies regarding these laws.  Nevertheless, Defendants ignored these authorities.

131.    For example, on January 31, 2005, the OIG issued guidance which provides: "Hospitals should also be aware of the Federal anti-kickback statute, section 1128B(b) of the Act, and the constraints it places on business arrangements related directly or indirectly to items or services reimbursable by any Federal health care program, including, but not limited to, Medicare. The anti-kickback statute prohibits in the health care industry some practices that are common in other business sectors, such as offering gifts to reward past or potential new referrals." OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed. Reg. 4,858, 4,864 (Jan. 31, 2005).

132.    The OIG has issued guidance on the requirements for medical directorships, making it clear that medical directorships are only appropriate when remuneration is paid in exchange for fair market value for services rendered.  *See, e.g.,* A Roadmap for New Physicians, Avoiding Medicare and Medicaid Fraud and Abuse, *available at* https://oig.hhs.gov/documents/compliance/981/roadmap_web_version_.pdf (last visited Oct. 7, 2022); Fraud Alert: Physician Compensation Arrangements May Result in Significant Liability (Jun. 9, 2015), *available at* https://oig.hhs.gov/documents/other-

1  guidance/903/Fraud_Alert_Physician_Compensation_06092015.pdf (last visited Oct. 7, 2022); HHS

2  Office of Inspector General, Advisory Opinion 98-16 (Nov. 10, 1998), *available at*

3  https://oig.hhs.gov/documents/advisory-opinions/391/AO-98-16.html (when "a party gives an

4  existing or potential referral source valuable services or goods for free or below fair market value . . .

5  an inference arises that one purpose of the arrangement is to induce or reward referrals.")

6      133.    The Affordable Care Act, passed in March 2010, made explicit that violations of the

7  Anti-Kickback Statute (42 U.S.C. § 1320a-7b) gave rise to False Claims Act liability: "a claim that

8  includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false

9  or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

10                          **VIII.   CAUSATION**

11      134.    "A plaintiff satisfies the FCA's causation requirement if the defendant 'presents, or

12  causes to be presented,' a false or fraudulent claim to the United States for payment or approval."

13  *United States ex rel. Puhl v. Terumo BCT*, CV 17-8446-PSG (JPRx), 2020 U.S. Dist. LEXIS 140157,

14  at *3 (C.D. Cal. Mar. 18, 2020) (citations omitted). Relators need only show that Defendants' conduct

15  was a substantial factor in bringing about the false claims and such claims were a foreseeable and

16  natural consequence of its conduct." *See United States ex rel. Brown v. Celgene Corp.*, CV 10-3165-

17  GHK (SSx), 2014 U.S. Dist. LEXIS 99815, at *8 (C.D. Cal. July 10, 2014).

18      135.    Here, Relators have sufficiently alleged that all Defendants have caused the submission

19  of false claims to the United States Government and private insurers by paying illegal kickbacks to

20  Dr. Kurtzman for his role as a "medical director" for little or no services rendered, as set forth in full

21  detail above.

22                      **IX.    CAUSES OF ACTION**
                        **FIRST CAUSE OF ACTION**
23                       **On Behalf of the United States**
                          **Federal False Claims Act**
24                            **31 U.S.C. § 3729**
25              **Alleged Against Defendant Dr. Kurtzman**

26      136.    Plaintiffs incorporate by reference and reallege all the allegations contained in the

27  above paragraphs of this Complaint as though fully set forth herein.

28

137.    The False Claims Act allows a public entity to recover damages from any person or entity that knowingly presents a false claim for payment or approval. The Relator is an individual who brings this action on behalf of the United States Government.

138.    Isoray violated the AKS, and therefore the False Claims Act, by paying remuneration to Dr. Kurtzman in the amount of $18,333 per month in exchange for Dr. Kurtzman's continued use of Isoray's premium isotope, Cesium-131.

139.    Dr. Kurtzman violated the AKS, and therefore the False Claims Act, by receiving and accepting remuneration in the amount of $18,333 per month in exchange for Dr. Kurtzman's continued use of Isoray's premium isotope, Cesium-131.

140.    Relator claims that Dr. Kurtzman, and/or the hospitals and ambulatory health centers for which he provides services caused to be presented a false claim to, *inter alia*, Medicare for payment or approval.

141.    Dr. Kurtzman knowingly caused to be presented a false or fraudulent claim to the United States Government for payment or approval.

142.    Dr. Kurtzman knowingly caused to be presented false records and statements, including, but not limited to, bills, invoices, requests for reimbursement, and records of services, to obtain payment or approval of charges by Medicare and other government-funded programs that were higher than they were permitted to claim or charge by applicable law.  Among other things, Dr. Kurtzman knowingly caused the submission of false claims for Medicare and other government programs' business that were ineligible for reimbursement due to illegal kickbacks.

143.    Dr. Kurtzman caused to be made or used false records or statements – *i.e.*, the false certifications and representations made and caused to be made by hospitals or ambulatory service centers when submitting the false claims for payments; and the false certifications made by hospitals or ambulatory service centers in submitting claims and annual cost reports to get false or fraudulent claims paid and approved by the United States Government, and that were material to the United States Government's payment of the false claims at issue in this case.

144.    The claim was false and/or fraudulent in that Dr. Kurtzman only ordered the Cesium-131 isotope from Isoray in exchange for his role as a medical director whereby he received an $18,333

monthly payment, but he did not actually perform any medical directorship work for which payment was made (by Isoray).

145. A claim submitted to the United States Government in violation of the federal AKS is *per se* material.

146. Dr. Kurtzman's false or fraudulent claim was material to the United States Government's decision to pay out money to Dr. Kurtzman, and/or the ambulatory centers and/or hospitals he worked with.

147. Dr. Kurtzman knew, or acted with reckless disregard, or deliberate ignorance, that these claims were false, because he knows he did not perform work in exchange for the remuneration received from Isoray for his medical directorship.

148. The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

149. Wherefore, Plaintiffs pray for relief as further set forth below.

## SECOND CAUSE OF ACTION
### On Behalf of the United States
### Federal False Claims Act
### 31 U.S.C. § 3729
### Alleged Against Defendants CEO Woods and Isoray

150. Plaintiffs incorporate by reference and reallege all the allegations contained in the above paragraphs of this Complaint as though fully set forth herein.

151. The False Claims Act allows a public entity to recover damages from any person or entity that knowingly presents a false claim for payment or approval. The Relator is an individual who brings this action on behalf of the United States Government.

152. Isoray violated the AKS, and therefore the False Claims Act, by paying remuneration to Dr. Kurtzman in the amount of $18,333 per month in exchange for Dr. Kurtzman's continued use of Isoray's premium isotope, Cesium-131.

153. Dr. Kurtzman violated the AKS, and therefore the False Claims Act, by receiving and accepting remuneration in the amount of $18,333 per month in exchange for Dr. Kurtzman's continued use of Isoray's premium isotope, Cesium-131.

154.    Relator claims that CEO Woods and Isoray caused to be presented a false claim to, *inter alia*, Medicare for payment or approval.

155.    CEO Woods and Isoray caused to be presented a false or fraudulent claim to the United States Government for payment or approval.

156.    CEO Woods and Isoray knowingly caused to be presented false records and statements, including, but not limited to, bills, invoices, and requests for reimbursement, to obtain payment or approval of charges by Medicare and other government-funded programs that were higher than they were permitted to claim or charge by applicable law.  Among other things, CEO Woods and Isoray knowingly caused the submission of false claims for Medicare and other government programs' business that were ineligible for reimbursement as a result of illegal kickbacks.

157.    CEO Woods and Isoray caused to be made or used false records or statements – *i.e.*, the false certifications and representations made and caused to be made by hospitals or ambulatory service centers when submitting the false claims for payments; and the false certifications made by hospitals or ambulatory service centers in submitting claims and annual cost reports to get false or fraudulent claims paid and approved by the United States Government, and that were material to the United States Government's payment of the false claims at issue in this case.

158.    The claim was false and/or fraudulent in that Dr. Kurtzman only ordered the Cesium-131 isotope from Isoray in exchange for his role as a medical director whereby he received an $18,333 monthly payment, but he did not actually perform any medical directorship work for which payment was made (by Isoray).

159.    A claim submitted to the United States Government in violation of the federal AKS is *per se* material.

160.    These false or fraudulent claims were material to the United States Government's decision to pay out money to Dr. Kurtzman, and/or the ambulatory centers and/or hospitals he worked with.

161.    Claims for services related to Cesium-131 performed by Dr. Kurtzman were false because they were obtained in violation of the AKS, and therefore the FCA.  Dr. Kurtzman violated

1   the AKS by receiving remuneration in the amount of $18,333 in exchange for his continued use of

2   Cesium-131.

3         162.     Isoray knew or acted with reckless disregard, or deliberate ignorance, that these claims

4   were false, because they knew it was illegal to pay Dr. Kurtzman as a medical director when he

5   performed no work, had no formal contract, and did not submit statements or timesheets for payment.

6         163.     CEO Woods knew that these claims were false, and that it was illegal to pay Dr.

7   Kurtzman as a medical director when he performed little to no work, because Relator informed CEO

8   Woods, on a number of occasions, that this arrangement was illegal, as set forth above in Paragraphs

9   124 through 128.

10         164.     The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial

11   factor in causing the United States Government to sustain damages in an amount according to proof.

12         165.     Wherefore, Plaintiffs pray for relief as further set forth below.

13

**THIRD CAUSE OF ACTION**
**On Behalf of Relator**
**Federal False Claims Act**
**31 U.S.C. § 3730(h)**
**Alleged Against Defendants CEO Woods and Isoray**

14

15

16

        166.     Plaintiffs incorporate by reference and reallege all the allegations contained in the

17

above paragraphs of this Complaint as though fully set forth herein.

18

        167.     Isoray violated the AKS, and therefore the False Claims Act, by paying remuneration

19

to Dr. Kurtzman in the amount of $18,333 per month in exchange for Dr. Kurtzman's continued use

20

of Isoray's premium isotope, Cesium-131.

21

        168.     Dr. Kurtzman violated the AKS, and therefore the False Claims Act, by receiving and

22

accepting remuneration in the amount of $18,333 per month in exchange for Dr. Kurtzman's continued

23

use of Isoray's premium isotope, Cesium-131.

24

        169.     CEO Woods and Isoray discharged Relator because she acted to stop a false claim by

25

reporting and advising against the continuing the medical directorship of Dr. Kurtzman when he

26

performed very little to no work in exchange for the large monthly sums of $18,333 remunerated by

27

Defendants CEO Woods and Isoray.

28

170.    Relator was an employee of Isoray, working as Vice President of Sales and Marketing from April 5, 2021 through January 17, 2022.

171.    Dr. Kurtzman is alleged to have defrauded the United States Government of money, property, or services by causing a false or fraudulent claim to be submitted to the United States Government for payment or approval.

172.    In June 2021, Relator informed Vice President of Business Development, Lisa Lauer, and Vice President of Finance, Mark Austin of her many concerns about these inappropriate payments and further advised that the payments posed a significant legal risk.

173.    On June 24, 2021, Relator Ms. advised Ms. Woods of the legal risk to the Company. Ms. Fort further advised that the payments made to Dr. Kurtzman were easily traceable, and that Isoray must provide invoice documentation to support the monthly payments.  CEO Woods explained that Isoray was a small company that could "fly under the radar."

174.    On January 17, 2022, two (2) days before the FDA would conduct an onsite investigation of Isoray, CEO Woods and Chief Operating Officer Jennifer Streeter called and terminated Relator, seemingly out of nowhere.

175.    Relator was harmed in that she lost her job, her health insurance, and all other benefits while acting to stop an illegal act in violation of federal laws.

176.    Relator seeks damages as set forth below in the Prayer for Relief.

177.    Dr. Kurtzman's false or fraudulent claim was material to the United States' decision to pay out money to Dr. Kurtzman, and/or the ambulatory centers and/or hospitals he worked with.

178.    Dr. Kurtzman knew, or acted with reckless disregard, or deliberate ignorance, that these claims were false, because he knows he did not perform work in exchange for the remuneration received from Isoray for his medical directorship.

179.    Wherefore, Plaintiffs pray for relief as set forth below.

**FOURTH CAUSE OF ACTION**
**On Behalf of the State of California**
**California Insurance Frauds Prevention Act**
**California Insurance Code § 1871.7**
**Alleged Against Dr. Kurtzman**

180.    Plaintiffs incorporate by reference and reallege all the allegations contained in the above paragraphs of this Complaint as though fully set forth herein.

181.    The IFPA has been construed as prohibiting charging private insurers for services procured via kickbacks.

182.    The IFPA provides for civil recoveries against persons who violate the provisions of the Act or the provisions of California Penal Code sections 549 or 550, including recovery of up to three times the amount of any fraudulent insurance claims, and fines of between $5,000 and $10,000 for each such claim. Cal. Ins. Code § 1871.7(b).

183.    Subsection (b) of Cal. Ins. Code § 1871.7 provides for civil recoveries against persons who violate the provisions of Penal Code sections 549 or 550. Section 550 of the Penal Code prohibits the following activities, among others:

a.    (a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:

b.    (5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim. (6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

c.    (b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following: (1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact. (2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

d.    (3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled. Cal. Penal Code § 550.

184.    For the reasons stated in Counts 1 and 4, Dr. Kurtzman violated the IFPA by accepting remuneration from Isoray when he did not render services for such payment.

185.    Dr. Kurtzman caused false and/or fraudulent claims to be submitted to private insurers, in addition to Medicare and other government programs.

186.    Wherefore, Plaintiffs pray for relief under this Section as set forth below in the Prayer for Relief.

### FIFTH CAUSE OF ACTION
**On Behalf of the State of California**
**California Insurance Frauds Prevention Act**
**California Insurance Code § 1871.7**
**Alleged Against Defendants CEO Woods and Isoray**

187.    Plaintiffs incorporate by reference and reallege all the allegations contained in the above paragraphs of this Complaint as though fully set forth herein.

188.    The IFPA has been construed as prohibiting charging private insurers for services procured via kickbacks.

189.    The IFPA provides for civil recoveries against persons who violate the provisions of the Act or the provisions of California Penal Code sections 549 or 550, including recovery of up to three times the amount of any fraudulent insurance claims, and fines of between $5,000 and $10,000 for each such claim. Cal. Ins. Code § 1871.7(b).

190.    Subsection (b) of Cal. Ins. Code § 1871.7 provides for civil recoveries against persons who violate the provisions of Penal Code sections 549 or 550. Section 550 of the Penal Code prohibits the following activities, among others:

a.    (a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:

b.    (5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim. (6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

c.    (b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following: (1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy,

knowing that the statement contains any false or misleading information concerning any material fact. (2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

   d.    (3) Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled. Cal. Penal Code § 550.

191.    Defendants CEO Woods and Isoray violated the IFPA by providing remuneration to Dr. Kurtzman when he did not render services for such payment.

192.    As such, Defendants CEO Woods and Isoray caused false and/or fraudulent claims to be submitted to private insurers, in addition to Medicare and other government programs.

193.    Wherefore, Plaintiffs pray for relief under this Section as set forth below in the Prayer for Relief.

**SIXTH CAUSE OF ACTION**
**On Behalf of Relator**
**California Insurance Frauds Prevention Act**
**California Insurance Code § 1871.7(e)**
**Alleged Against Defendants CEO Woods and Isoray**

194.    Plaintiffs incorporate by reference and reallege all the allegations contained in the above paragraphs of this Complaint as though fully set forth herein.

195.    CEO Woods and Isoray discharged Relator because she acted to stop insurance fraud by reporting and advising against the continuing the medical directorship of Dr. Kurtzman when he performed very little to no work in exchange for the large monthly sums of $18,333 remunerated by Defendants CEO Woods and Isoray.

196.    Relator was an employee of Isoray, working as Vice President of Sales and Marketing from April 5, 2021 through January 17, 2022.

197.    Dr. Kurtzman is alleged to have defrauded California insurers out of money, property, or services by causing a false or fraudulent claim to be submitted to private insurers for payment or approval.

COMPLAINT
34

198.    In June 2021, Relator informed Vice President of Business Development, Lisa Lauer, and Vice President of Finance, Mark Austin of her many concerns about these inappropriate payments and further advised that the payments posed a significant legal risk.

199.    On June 24, 2021, Relator Ms. advised Ms. Woods of the legal risk to the Company. Ms. Fort further advised that the payments made to Dr. Kurtzman were easily traceable, and that Isoray must provide invoice documentation to support the monthly payments.  CEO Woods explained that Isoray was a small company that could "fly under the radar."

200.    On January 17, 2022, two (2) days before the FDA would investigate at Isoray, CEO Woods and Chief Operating Officer Jennifer Streeter called and terminated Relator, seemingly out of nowhere.

201.    Relator was harmed in that she lost her job, her health insurance, and all other benefits while acting to stop an illegal act in violation of state and federal laws.

202.    Relator seeks damages as set forth below in the Prayer for Relief.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by and through Relator, pray for judgment in their favor and against Defendants as follows:

a.    On Counts 1 and 2, for presenting, or causing to be presented, false claims, pursuant to 31 U.S.C. § 3729(a)(1)(A), and damages as provided by 31 U.S.C. § 3729(a)(1), as follows:

      i.    Triple the amount of damages sustained by the government;

      ii.    Civil penalties in the amount of $11,000 for each false claim;

      iii.    Recovery of costs;

      iv.    Pre- and post-judgment interest; and

      v.    Such other and further relief as the Court deems just and proper.

b.    On Counts 4 and 5, for damages as provided by California Insurance Fraud Prevention Act § 1871.1 et seq., as follows:

      i.    Civil penalties of $10,000 for each false and fraudulent claim submitted, presented, or caused to be submitted or presented, t an insurance company;

1      ii. Assessments of three (3) times the amount for each claim for compensation

2  made by Defendants;

3        iii. Recovery of costs;

4        iv. Pre- and post-judgment interest; and

5        v. Such other and further relief as the Court deems just and proper.

6    c. For Counts 3 and 6, under the federal FCA and the IFPA, for damages as follows:

7      i. That Relator be reinstated with the same seniority she would have had if not for

8  suffering retaliation;

9      ii. Twice the amount of backpay she is due plus interest;

10     iii. Punitive damages in an amount to be determined according to proof; and

11     iv. Attorney's fees and costs

12    d. Plaintiffs request that Relator receive such maximum amount as permitted by law, of

13  the proceeds of this action, or settlement of this action, collected by the United States Government

14  and/or private insurers, plus an amount for reasonable expenses incurred, plus reasonable attorney's

15  fees and costs of this action. Relator requests that her percentage be based on the total value recovered,

16  including any amounts received from individuals or entities who are not parties to the instant action.

17

18    Dated: October 7, 2022

19

20               Respectfully submitted,

21               */s/ Jason H. Kim*
                  Todd M. Schneider (SBN 158253)

22               Matthew S. Weiler (SBN 236052)
                  Sunny S. Sarkis (SBN 258073)

23               **SCHNEIDER WALLACE**
                  **COTTRELL KONECKY LLP**

24               2000 Powell Street, Suite 1400
                  Emeryville, CA 94608

25               Telephone: (415) 421-7100
                  tschneider@schneiderwallace.com

26               jkim@schneiderwallace.com
                  mweiler@schneiderwallace.com

27               ssarkis@schneiderwallace.com

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jason H. Kim (SBN 220279)
**SCHNEIDER WALLACE
COTTRELL KONECKY LLP**
300 S. Grand Avenue, Suite 2700
Los Angeles, CA 90071
Telephone: (415) 421-7100
jkim@schneiderwallace.com

*Counsel for Plaintiffs*